352 So.2d 808 (1977)
Paula Johnson LONGTIN, T.B. Ray, Administrator of Estate of Robert Paul Johnson
v.
Miss Nannie WITCHER.
No. 49741.
Supreme Court of Mississippi.
November 30, 1977.
*809 Parsons & Matthews, Thomas M. Matthews, Jr., Wiggins, for appellant.
Thornton & Dorrill, George L. Dorrill, Kosciusko, for appellee.
Before SMITH, LEE and BOWLING, JJ.
LEE, Justice, for the Court:
The Chancery Court of Choctaw County entered a decree adjudging Miss Nannie Witcher to be the owner of certain real and personal property and Paula Johnson Longtin and T.B. Ray, Administrator of the Estate of Robert Paul Johnson, appeal.
Appellants assign the following errors in the trial below:
(1) The court erred in finding that a gift of the municipal bonds was made to Nannie Witcher by Robert Paul Johnson during his lifetime.
(2) The court erred in finding that the transfer by Robert Paul Johnson to Nannie Witcher of the store and washeteria, the travel trailer, and the Chevrolet vehicle was not the result of Nannie Witcher's abuse by undue influence of her confidential and fiduciary relationship with Robert Paul Johnson.
(3) The court erred in failing to sustain appellants' motion to exclude the evidence and direct a verdict for them after appellee rested her case.
(4) The court erred in allowing introduction into evidence of a bill of complaint for divorce filed in Hinds County on October 1, 1968, by Robert Paul Johnson against Bennie Jean Johnson, his wife, and in allowing introduction into evidence of the decree granting the divorce entered December 6, 1968.
The property involved in this case is (1) a twenty-foot house trailer, (2) a 1962 Chevrolet truck, (3) savings account in Jackson Savings & Loan Association, (4) a 1971 Chrysler automobile, and (5) one hundred nineteen thousand dollars ($119,000) in municipal bonds. Robert Paul Johnson, age sixty-one (61) at the time of his death, operated a mercantile business near Weir, Mississippi. His living quarters were located in the store building. In 1949, Nannie Witcher, aged nineteen (19) years, moved from French Camp, where she had finished high school, to the Johnson place and began to work for him in the store. For the first year she lived in a trailer, belonging to Johnson, situated at the rear of the store. After the first year, she moved into the living quarters of the store building where she occupied one bedroom and Johnson occupied another. She had full and complete charge of everything pertaining to the operation of the store and the gasoline business. In addition, she cooked for Johnson, performed the household chores, and took care of him during the years of his failing health from 1969 until his death in 1974.
On June 19, 1970, Johnson executed a general warranty deed to Nannie Witcher conveying unto her the store building and property. The instrument was duly recorded in the Chancery Clerk's office of Choctaw County. At the same time, Johnson conveyed the house trailer to her by a properly executed bill of sale. On the 11th day of February, 1971, he transferred the Chevrolet half-ton pickup truck to her and, subsequently, on November 17, 1972, he purchased for her and placed in her name, a 1971 Chrysler automobile. The store business was operated by Miss Witcher in her own name, the county privilege license, firearms license (from Department of Treasury's Bureau of Alcohol, Tobacco and Firearms), and Mississippi State Permit to Engage in Business, were all issued in her name and all checks drawn in the operation of the business had her name printed thereon and were signed by her.
*810 Mr. Johnson was divorced from his wife on December 6, 1968. The only child born of the marriage was Paula Johnson Longtin, one of the appellants. She was twelve (12) years old when the divorce was granted. From that time until Johnson's death, there were strained feelings and friction between his daughter and him, she visited him infrequently and she declined to live with him, although he had requested her to do so. In the late summer of 1974, Johnson's nephew, Jacob Lamar Adcock, convinced Johnson that he should go to Albuquerque, New Mexico, where Adcock lived, and submit to heart surgery. Adcock came to Mississippi by airplane for the purpose of driving Johnson and Miss Witcher to Albuquerque. On August 8, 1974, in the presence of Adcock, Johnson placed the municipal bonds in a paper sack while at the store (they had previously been kept by Miss Witcher in her own lock box) with the statement that they were her bonds and that she should place them in her lock box. Johnson, Adcock and Miss Witcher went to her bank in Ackerman, Adcock waited on the inside of the bank, and Johnson and Miss Witcher went to her lock box and returned without the bonds. During this time, appellant Longtin was at the store and had spent the previous night there accompanied by her sister-in-law. Johnson had the windows and doors of the store building nailed up with boards and he, Adcock and Miss Witcher started for Albuquerque in her Chrysler automobile. Appellant Longtin and her sister-in-law were left outside the building where they waited approximately an hour for a friend to take them home.
Johnson was in Albuquerque several days and died before entering the hospital. He was buried in Albuquerque at his request. After the funeral, Adcock and Miss Witcher came to Mississippi by airplane, she entered her lock box, got the bonds, and they flew back to Albuquerque where an inventory of the bonds was made by Adcock.

I.
Did the trial court err in finding that a gift of the municipal bonds was made to Nannie Witcher by Robert Paul Johnson during his lifetime?

II.
Did the court err in finding that the transfer by Robert Paul Johnson to Nannie Witcher of the store and washeteria, the travel trailer, and the Chevrolet vehicle was not the result of Nannie Witcher's abuse by undue influence, or her confidential and fiduciary relationship with Robert Paul Johnson?

III.
Did the court err in failing to sustain appellants' motion to exclude the evidence and direct a verdict for them after appellee rested her case?
Appellants contend that a valid inter vivos gift of the municipal bonds was not made to Miss Witcher and that the bonds and conveyances of real and personal property were obtained by undue influence. They further contend that a confidential relationship existed between Miss Witcher and Johnson, and that, therefore, the gifts and transfers are presumed to be obtained through undue influence because of that relationship. It is not necessary to decide whether a confidential relationship existed for the reason that the evidence is clear and convincing that the gifts were made freely, in good faith, with full knowledge, and with independent consent and action. This Court said in Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926):
"The transaction is not necessarily voidable, it may be valid, but a presumption of its invalidity arises which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action." 146 Miss. at 173, 110 So. at 584.
In Hickey v. Anderson, 210 Miss. 455, 49 So.2d 713 (1951), the Court stated:
"It is well established in Mississippi and elsewhere that where a confidential relationship is shown to exist between parties to the deed, and where the grantee, who *811 is the beneficiary, is the dominant spirit in the transaction, the law raises a presumption of undue influence... ." 210 Miss. at 462, 49 So.2d at 716.
The Court discussed what constitutes influence in Burnett v. Smith, 93 Miss. 566, 47 So. 117 (1908):
"[N]ot every influence is undue, and undue influence cannot be predicated of any act unless free agency is destroyed, and that influence exerted `by means of advice, arguments, persuasion, solicitation, suggestion, or entreaty is not undue, unless it be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will and take away its free agency. Nor is influence ordinarily considered undue which arises out of sympathy, kindness, attention, attachment or affection, gratitude for past services, desire of gratifying the wishes of another or of relieving distress, claims of kindred and family or other intimate personal relations, love, esteem, social relations, prejudices, or flattery.'" 93 Miss. at 572, 47 So. at 118.
The great weight of the evidence indicates that Johnson was an independent, strong-willed and aggressive person, while Miss Witcher was shy and retiring, and the record reflects that she was dominated by him rather than that he was influenced by her.
The essentials of a valid inter vivos gift require that there is a donor competent to make a gift, there is a voluntary act on his part with the intention to make a gift, the gift must be complete with nothing left to be done, the property must be delivered by the donor and accepted by the donee, and the gift must be gratuitous and irrevocable. Jenkins v. Jenkins, 278 So.2d 446 (Miss. 1973).
The chancellor made the following findings of fact:
"The Court further finds that the charge of undue influence against Miss Nannie Witcher on Robert Paul Johnson was not established by the evidence and in fact the Court is of the opinion and so finds that there was none exerted on her part on the said Robert Paul Johnson. Robert Paul Johnson, according to the evidence, was a strong willed man, was a man of good judgment, a shrewd trader and businessman, and one that would be difficult to influence. The Court finds, therefore, that all of the property hereinabove identified, except that hereinafter mentioned, was given by Robert Paul Johnson to Miss Nannie Witcher freely and voluntarily and that it was gratuitous and irrevocable; that he was a man of mental competency and fully capable of knowing what he was doing, and that Miss Nannie Witcher was thoroughly capable of knowing and understanding what was going on and was competent to receive said gifts. The Court finds that all of the essential elements of inter vivos gifts under the laws of the State of Mississippi were present in this case; that the donor was competent to make the gift or gifts; that they were free and voluntary on his part; that he intended to make said gifts and frequently expressed his intention to so do; that the donee was capable of taking the gifts and that the gifts were complete and nothing was left to be done; that the property that was the subject of the gift or gifts was delivered by the donor and accepted by the donee; that the gifts took immediate effect from the time that they were made; that they were absolute, gratuitous and irrevocable; that all of the property which was the subject of these two lawsuits is now the property, both personal and real, of Miss Nannie Witcher with the exception of the following: the stock of goods and other personal property making up the Johnson Grocery Store and the three rings. Miss Nannie Witcher made no claim to the rings but they were delivered by her during the progress of the trial to Paula Johnson Longtin."
The chancellor found for every essential of a valid inter vivos gift and that the gifts and conveyances were not made as a result of undue influence, but were freely, voluntarily and knowingly made. We are unable to say that the chancellor was manifestly *812 wrong in such findings. Consequently, there is no error in the above assignments.

IV.
Did the court err in allowing introduction into evidence of a bill of complaint for divorce filed in Hinds County on October 1, 1968, by Robert Paul Johnson against Bennie Jean Johnson, his wife, and in allowing introduction into evidence of the decree granting the divorce entered December 6, 1968?
The purpose of introducing the bill of complaint, which charged desertion and adultery, and the decree of divorce apparently was to show the estrangement and ill will which existed between Johnson and his wife, and that, as a result of same, Johnson's daughter probably was influenced against him. However, it is not necessary to decide whether the instruments were admissible on the collateral issue of estrangement for the reason that contempt citations and writs of garnishment were admitted in evidence, without objection, indicating process was obtained from the court to enforce the decree pertaining to child support. Further, there was testimony, without objection, relating to allegations contained in the bill of complaint and to parts of the decree. Also, the proof without such evidence was sufficient to sustain the decree and the result reached by the chancellor is the same had the instruments not been admitted. Consequently, if there were error, it is not reversible error. Gunter v. Reeves, 198 Miss. 31, 21 So.2d 468 (1945); Sample v. Romine, 193 Miss. 706, 8 So.2d 257, Sugg. of Error overruled, 193 Miss. 706, 9 So.2d 643, corrected 193 Miss. 706, 10 So.2d 346 (1942); Melton Hardware Co. v. Heidelberg, 91 Miss. 598, 44 So. 857 (1907).
For the reasons stated, the decree must be and is affirmed.
AFFIRMED.
PATTERSON, C.J., INZER and SMITH, P. JJ., and ROBERTSON, SUGG, WALKER, BROOM and BOWLING, JJ., concur.